DECISION.
The Hamilton County Court of Common Pleas denied the motion of appellant, Security Rug Cleaning Company, for a preliminary injunction and a permanent injunction. Security sought to enforce restrictive covenants contained in the employment contracts of its former employees, appellees Jay Sams and James Wolterman. We affirm the judgment of the trial court.
 I. FACTS
Security Rug Cleaning Company is a Cincinnati corporation with two divisions. One division specializes in cleaning oriental rugs, and the other in restoration. The restoration division restores homes and furnishings damaged by fire, water, wind and other natural disasters to their pre-disaster condition. During the appellees' tenure with Security, the restoration division was run by a total of four employees, including appellees.
The evidence and testimony below showed that restoration is a competitive business. Most restoration work is obtained through insurance adjusters, who invite companies to bid on restoration jobs. On occasion, an adjuster simply skips the bidding process and requests the services of a certain company. Although the holder of the insurance policy has the final decision as to which company will perform the restoration work, the adjusters' advice and suggestions substantially influence this decision.
Jay Sams was hired by Security's restoration division in November 1988. At that time, he executed a document entitled "AGREEMENT REGARDING CONFIDENTIAL INFORMATION." Paragraph three of this agreement provided:
3. Non-Compete Agreement. For a period of two (2) years from the termination of employment with or without cause, the Employee shall not, either for the Employee or on behalf of any person, firm, corporation or any other operation or entity, directly or indirectly own, control, or participate in the ownership or control of, or be employed by or on behalf of, any business which is similar to and is competitive with the business of the Company including, but not limited to, fire and water damage restoration and reconstruction, within Hamilton County or within a 25 mile radius of Cincinnati, Ohio.
Sams did not have significant knowledge of the restoration business before joining Security. He attended seminars to learn techniques for restoring items damaged by fire and water and to learn how to generate and increase restoration business. His primary responsibility at Security was to establish rapport with insurance adjusters in order to be invited to bid on restoration projects. Security provided Sams with an expense account, which he used to take adjusters to lunch and dinner; access to tickets for Reds and Bengals games, to which he took adjusters; and funds enabling him to play in a weekly golf league with insurance adjusters. Sams was indisputably outstanding in this role and was critical to Security's success.
In 1990 and again in 1993, Sams informed Security that he was resigning from his position. Each time, Security negotiated with Sams to establish a different compensation package, and Sams agreed to stay. In neither instance did Sams re-sign any document containing a post-employment restrictive covenant.
James Wolterman was hired by Security's restoration division in July 1991. At that time, he, too, executed a "Confidential Information Agreement" that contained a paragraph identical to that quoted above. While Sams's duties for Security were sales-oriented, Wolterman's duties were more administrative. He attended seminars and interacted with adjusters, but not nearly to the extent that Sams did. The record discloses that, instead, Wolterman oversaw the actual restoration work. This job involved engaging the necessary subcontractors for each project and ensuring completion of the projects. Wolterman's experience in construction was valuable to Sams because Sams relied on that expertise to discuss the logistics of the restoration process with the insurance adjusters and to increase the company's chance to obtain bids or make winning bids.
In June 1996, Wolterman approached Security's chief financial officer, Mark Bubash, and requested a raise. Bubash told Wolterman that his salary would not be increased, and that if Wolterman were unhappy, he could leave Security's employ. Wolterman testified below that this was the catalyst for his resigning from Security in August 1996. However, he also acknowledged that since Sams left Security, he had no incentive to stay because, in his mind, Sams was the restoration business.
Sams and Wolterman resigned from Security in August 1996, after forming a partnership that they named Great Oaks Construction. Sams and Wolterman planned to perform construction, renovation and restoration work through their newly formed company. The record discloses that Sams and Wolterman actually prepared for their new venture during the last weeks of their employment with Security, soliciting jobs, performing work and informing adjusters about their establishment of Great Oaks Construction.
The two other employees who, along with Sams and Wolterman, constituted Security's entire restoration staff also resigned shortly thereafter. In its first five months of operation, Great Oaks was awarded thirty-five of the fifty-nine contracts on which it bid, and generated gross income of $110,000.
 II. PROCEDURE BELOW
On December 31, 1996, Security filed its complaint seeking a temporary restraining order ("T.R.O.") against Sams. The lower court held a three-day evidentiary hearing on the motion and, on February 5, 1997, notified the parties of its decision to deny the T.R.O. The court held that Sams had resigned from his position at Security on two occasions and had renegotiated the terms of his employment without ever re-signing the restrictive covenant. The court therefore held that the non-compete agreement expired, at the latest, on the date of Sams's resignation in 1993.
Security thereafter amended its complaint to include Wolterman as a defendant, and both Wolterman and Sams participated in the proceedings on the preliminary and permanent injunctions. On May 23, 1997, Security filed a "post-trial brief." The lower court treated the brief as a motion for the court to reconsider its ruling on the T.R.O., and it denied the motion on the grounds that the "post-trial brief" presented nothing that had not already been considered. On July 25, 1997, the lower court denied the preliminary and permanent injunctions as to both Sams and Wolterman. The court stated that its reasons for overruling the motions were the same as those expressed for denying the T.R.O.
From that judgment, Security brings this timely appeal in which it advances two assignments of error. Because we find neither assignment to have merit, we affirm the judgment of the court below.
 III. ASSIGNMENTS OF ERROR
In its first assignment of error, Security urges that the lower court erred by failing to enjoin Sams's and Wolterman's operation of Great Oaks and competition with Security. Security argues in support of this assignment that the decision of the trial court is against the manifest weight of the evidence and unreasonable and arbitrary, and that the court therefore abused its discretion in failing to issue the injunctions. Security primarily attacks the trial court's determination that Sams's non-compete agreement expired prior to the time that he resigned in 1996, and that this determination sufficed to deny the injunction against Wolterman.
In its second assignment of error, Security maintains that the lower court erred to the extent that it determined that the non-competition covenants are not enforceable. Security argues in support of this assignment that the agreements are enforceable because they are no greater than what is required for the protection of Security, do not impose undue hardship on Sams and Wolterman, and are not injurious to the public. We will discuss the assignments together.
 IV. THE LAW
In Ohio, an agreement restraining a person from competing with his former employer will be enforced under the rule of reasonableness to the extent that such restraint (1) is required to protect the legitimate interests of the employer; (2) does not impose an undue hardship on the former employee; and (3) is not injurious to the public. Raimonde v. VanVlerah (1975), 42 Ohio St.2d 21, 325 N.E.2d 544, paragraphs one and two of the syllabus; Rogers v. Runfola Associates, Inc. (1991),57 Ohio St.3d 5, 8, 565 N.E.2d 540, 541.
In addition to adducing clear and convincing evidence on each of these three elements, a plaintiff must show that actual irreparable harm will result or that an actual threat of such injury exists when the equitable remedy of injunction is sought. Ohio Urology, Inc. v. Poll (1991),72 Ohio App.3d 446, 594 N.E.2d 1027. A court will not order mandatory relief in the form of an injunction unless the facts supporting the request are "clear, * * * free from reasonable doubt, and disclose the prospect of irreparable injury to the complaint. Equity will not interfere where the anticipated injury is doubtful or speculative; reasonable probability of irreparable injury must be shown." Miller v. W. Carrollton
(1993), 91 Ohio App.3d 291, 296-297, 632 N.E.2d 582, 586.
In Garono v. State (1988), 37 Ohio St.3d 171, 173, 524 N.E.2d 496, 498, the Ohio Supreme Court stated:
An injunction is an extraordinary remedy in equity where there is no adequate remedy available at law. It is not available as a right but may be granted by a court if it is necessary to prevent a future wrong that the law cannot. The grant or denial of an injunction is solely within thetrial court's discretion and, therefore, a reviewing court should not disturb the judgment of the trial court absent a showing of a clear abuse of discretion. [Citations omitted, emphasis added.]
See, also, Perkins v. Quaker City (1956), 165 Ohio St. 120,133 N.E.2d 595, syllabus. A party claiming abuse of discretion must show more than an error by the trial court. The term abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemorev. Blakemore (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140, 1142
(citations omitted). Unless the trial court's decision to grant or deny injunctive relief is, in some way, unreasonable, arbitrary or unconscionable, it will not be disturbed on appeal. Garono, supra, at 173, 524 N.E.2d at 498.
 V. DISCUSSION
As we observed above, the lower court declined to issue a T.R.O. against Sams because it found that Sams had resigned from Security and then renegotiated a new employment contract without a restrictive covenant. According to the lower court's entry, the court denied the motions for preliminary and permanent injunctions against Sams and Wolterman for the same reason. Assuming without deciding that sufficient, credible evidence supported the lower court's determination that Sam's non-compete agreement had expired, that reason, standing alone, would not sustain the judgment in favor of Wolterman.
However, we need not reach that determination. As we set forth above, in order for Security to be entitled to injunctive relief against Sams and Wolterman, it was required to prove, among other things, that if Sams and Wolterman continued to perform restoration work within Hamilton County and/or a twenty-five-mile radius of Cincinnati, Security would suffer irreparable hann. After reviewing the entire record, as we are required to do on a claim that the lower court's decision was against the manifest weight of the evidence, we hold that Security failed in its burden on this element.
The record establishes that Sams and Wolterman were valuable employees. Together, they constituted one-half of Security's restoration work force. But most of Security's restoration work was performed by subcontractors, not Wolterman or Sams. Most of Wolterman's work for Security involved his ability to be a liason between the property owner, the insurance adjuster and the subcontractors that Security hired to perform the restoration. Sams's primary assignment was to establish business relationships with the insurance adjusters from whom Security received invitations to bid on restoration projects. Sams was also accomplished in bidding on the restoration jobs.
Security presented evidence that its business decreased after Sams's and Wolterman's departure. However, Security presented no evidence from which it could be inferred that the decline in business was due to Sams's and Wolterman's competition with Security, and not due to the mere fact that these two employees no longer worked for Security and that both of the remaining employees of the division also left. The evidence presented by Security showed only that the departure of Sams and Wolterman, and not the competition by those two, caused harm to Security's business.
The only evidence presented by Security to support its claim that its business was harmed by the competition from Great Oaks was its allegation that it suffered a decline in business from those adjusters who, in the past, had provided the greatest number of job opportunities for Security. Bubash, Security's chief financial officer, stated that he had noticed a "definite tapering off of the amount of jobs [Security] was able to quote." Security's president, Jeffrey Geier, testified that it was his "concern" that insurance adjusters would no longer call Security. Such speculation is insufficient to establish that actual harm had resulted or would result from Sams's and Wolterman's competition. Bubash and Geier both admitted that they could not really know, without information from the adjusters, whether Security had lost work to another company or whether the adjusters would have referred business to Security if Sams were not in competition with Security. Security did not present testimony from any adjusters in support of its argument that Great Oaks was taking away its business.
In fact, Bubash testified that the agents that he contacted after Sams's and Wolterman's departure stated that they still intended to refer business to Security. No adjuster informed Security that it would no longer be eligible to make bids on restoration projects. Geier testified that Security had experienced fluctuations in its business even when Sams and Wolterman were employed. Security presented evidence that Security and Great Oaks Construction bid against each other on only one restoration project, but neither firm was awarded the job. In its brief on appeal, Security admits that "[i]f Security doesn't get an opportunity to bid they won't know if they have lost business of not." Far from proving irreparable harm, the evidence presented by Security shows that itcannot determine whether it is suffering any harm from Sams's and Wolterman's competition.
Evidence that Great Oaks bid on over fifty projects and was awarded over thirty of them does not establish irreparable harm to Security, since Security presented no evidence that it would have been invited to bid on the projects or that it would have been awarded the jobs. Security argued that no other newly formed business would have been able to secure so many projects, and it therefore concluded, and asked the court below to conclude, that Great Oaks must have obtained the projects because of information or trade secrets imparted by Security. However, no evidence was presented to support this assertion, and "[e]quity will not interfere where the anticipated injury is doubtful or speculative." See Miller,supra, at 297, 632 N.E.2d at 586.
Other evidence was presented that the other two employees composing Security's restoration division also left Security shortly after Sams and Wolterman resigned. Security replaced Sams and Wolterman with a single employee, and evidence was presented that the mistakes of this inexperienced employee caused Security to lose business.
In short, the evidence presented below demonstrates that Sams and Wolterman could have left Security and started a business entirely unrelated to construction, rug cleaning or restoration and Security would still have suffered a loss in the competitive restoration market. After reviewing the entire record, particularly those parts of the record identified by Security as demonstrating irreparable harm, we hold that Security simply failed to present evidence that the competition from Sams and Wolterman, and not the loss of their services, presented an actual threat of irreparable harm.
For the foregoing reasons, we hold that the lower court did not abuse its discretion by denying Security's motions for injunctive relief. Accordingly, we overrule each of Security's assignments of error and affirm the judgment of the trial court.
Judgment affirmed.
M.B. Bettman and Sundermann, JJ., concur.